FLOYD R. GIBSON, Circuit Judge,
dissenting:
I respectfully dissent. The Real Estate Settlement Procedures Act (“RESPA”) was enacted “to insure that consumers throughout the Nation ... are protected from unnee-. essarily high settlement charges caused by certain abusive practices.” 12 U.S.C. § 2601 (1994). To facilitate this purpose, RESPA prohibits kickbacks and unearned fees:
No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.
12 U.S.C. § 2607(a) (1994). While secondary market transactions are exempted from RESPA’s coverage, see 24 C.F.R. § 3500.5(b)(7) (1997), I believe the Chandlers presented a genuine issue of material fact as to whether the arrangement designed by Custom, Norwest, and Equicon was a bona fide secondary market transaction. Therefore, I would reverse the district court’s judgment.
*1058 The regulations under RESPA provide that “[a] bona fide transfer of a loan obligation in the secondary market is not covered by RESPA.” Id. The regulation further provides that “[i]n determining what constitutes a bona fide transfer, HUD will consider the real source of funding and the real interest of the funding lender.” Id. Custom was able to show that the funds it borrowed for the Chandlers’ loan came from its direct line of credit with CoreStates. However, Custom had previously entered into a Purchase and Sale Agreement with Equicon and Norwest, under which Equicon would purchase loans from Custom to be held in trust with Norwest as the Trustee. Custom and Equicon had already agreed that Equicon would transfer funds to Custom’s CoreStates account to cover the loan amount shortly after the Chandlers’ loan closed. In fact, Custom and Equicon notified CoreS-tates of the planned funds transfer on January 3, 1996, three weeks before Custom provided the Chandlers with the loan amount. Therefore, even though Custom borrowed $57,156.25 against its line of credit with CoreStates, Custom knew that “[Equicon], on behalf of [Norwest],” Appellant’s App. at 16, would deposit that amount shortly after-wards. In fact, for Custom’s part in the deal, it received $3,018.75 from the Chandlers in loan origination and discount fees, as well as $7,160.43 from Equicon, on behalf of Norwest which included (1) the $3,018.75 loan origination and discount fees; (2) interest on Custom’s loan from CoreStates; and (3) $3,881.27 in yield spread points.
A bona fide secondary market transaction is one where a mortgage lender makes loans for its own portfolio and finances these loans from its own or borrowed funds and holds the loans for varying periods of time, or until maturity, with the option of selling its loans, usually in batches on the open market, and not in a preordained procedure where a party makes a loan knowing it will be transferred in due course in a matter of days to the ultimate lender. It appears to me that the transaction involved in this case is a pure circumvention of the Congressional legislation relating to federally related mortgage financing and marketing.
Based on the structure of the overall transáction, I believe that the “real source of funding” for the Chandlers’ loan was Equi-con, acting on behalf of Norwest.[6] In my view, the Chandlers presented a genuine issue of material fact as to whether Norwest gave and Custom accepted a fee based on Custom’s servicing of the Chandlers’ loan in violation of RESPA. See 12 U.S.C. § 2607(a). After viewing the facts in the light most favorable to the Chandlers, see Reich v. ConAgra, Inc., 987 F.2d 1357, 1359 (8th Cir.1993), the facts show that Custom and Norwest engaged in a sham transaction which was purposely designed to avoid coverage under RESPA. I do not believe Congress authorized this type of transaction; nor do I believe that this type of transaction is deserving of our judicial stamp of approval. Therefore, I would reverse the district court’s summary judgment in favor of Nor-west. Accordingly, I would also reverse the district court’s imposition of Rule 11 sanctions on the Chandlers’ attorney.

. A table funded loan is one in which "a loan is funded by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds.” 24 C.F.R. § 3500.2 (1997). The right to service the Chandlers' loan and to collect payments was assigned to Norwest on January 22, 1996. While the loan funds had not been deposited into Custom's CoreStates account at the time of closing, the parties had already agreed that such a transfer would occur. In fact, the record evidence established that Equicon deposited a total of $64,316.68 into Custom’s CoreStates account just five days after the loan closed.